231 N.W.2d 570 (1975)
194 Neb. 295
Sophie V. WEES, Appellant,
v.
CREIGHTON MEMORIAL ST. JOSEPH'S HOSPITAL, Appellee.
No. 39894.
Supreme Court of Nebraska.
July 10, 1975.
*572 Edward F. Fogarty, Robert H. Beach, Howard B. Westering, Omaha, for appellant.
David A. Svoboda, of Kennedy, Holland, DeLacy & Svoboda, Omaha, for appellee.
Heard before WHITE, C. J., and SPENCER, BOSLAUGH, McCOWN, NEWTON, CLINTON and BRODKEY, JJ.
SPENCER, Justice.
Plaintiff, Sophie Wees, appeals the order of the trial court dismissing her cause of action at the conclusion of her case-in-chief. We affirm.
Plaintiff was admitted to Creighton Memorial St. Joseph's Hospital on September 22, 1970, for psychiatric care. At that time she was 52 years of age. She was under the care of Doctor Chester H. Farrell. She had been his patient since 1947, and had been hospitalized approximately 10 times between 1947 and 1970. He diagnosed her as a catatonic schizophrenic. Her mental illness was characterized by recurring episodes during which she withdrew from contact with reality and became mute and quite withdrawn. She was hospitalized due to the onset of one of her periods of severe withdrawal.
On October 12, 1970, about 3:30 p. m., the plaintiff mentioned to a nurse that she had a pain in her arm. The arm was red and swollen. Subsequently it was discovered the arm was broken. Doctor Farrell testified plaintiff had a comminuted fracture of the left humerus and it was such that it had to be from a fall, but that she could have fallen against the wall without falling clear down. He also testified that it wouldn't be unusual for her to have had the injury and to have kept quiet about it. The exact details of how she broke her arm are not known, nor is there any testimony as to a fall except of plaintiff, which we detail hereafter.
The case was tried to a jury. Specifications of negligence charged the fall was due to: (1) Failure to restrain the plaintiff in her bed when the hospital knew or should have known plaintiff's condition required such action; (2) failure to use side railings; (3) allowing the plaintiff to leave her room while unattended by a nurse or other aide; and (4) failure to provide reasonable supervision and assistance in the form of surveillance and attendance by hospital personnel as required by hospital rules.
We review the record in accordance with the rule enunciated in Wrasse v. Gustavson (1975), 193 Neb. 41, 225 N.W.2d 274: "A motion for a directed verdict or its equivalent must be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party *573 against whom the motion is directed, and such party is entitled to have every controverted fact resolved in his favor and to have the benefit of every inference which can reasonably be deduced from the evidence."
In Foley v. Bishop Clarkson Memorial Hospital (1970), 185 Neb. 89, 173 N.W.2d 881, we held: "The proper measure of the duty of a hospital to a patient is the exercise of that degree of care, skill, and diligence used by hospitals generally in the community where the hospital is located or in similar communities." To meet this criteria the plaintiff introduced excerpts from the Creighton Memorial St. Joseph's Hospital Manual of Policies and Procedures for its Psychiatric Unit. Doctor Farrell testified these were at least equal to those of other hospitals in the community.
The plaintiff was confined in the psychiatric ward, which is a closed and controlled unit. It consisted of a number of rooms separated by a hallway, with a recreation area, a dining room, and a sun porch. The ward was locked and no one could leave it without supervision. For the first 4 days of plaintiff's confinement, she was restrained in a room by herself. Her wrists were tied down and she was unable to get out of bed. The bed had side rails. Pursuant to her doctor's orders, after the 4 days plaintiff was moved to a two-bedroom unit and all restraints were removed. She had the run of the psychiatric ward.
Plaintiff's daughter, who visited her three times a week, testified that about a week before October 12, her mother seemed to have dizzy spells, dropped a cup of coffee, and seemed a little worse to her. She wouldn't talk as much. The mother told her she felt dizzy and sleepy a lot of the time. She was not under restraint. When the daughter left, her mother walked with her to the door of the nurses' station which was about five doors from her room. She had an unsteady gait. The daughter called Dr. Farrell about it and asked him to put her mother in restraint again because she was dizzy.
When the daughter visited her mother the next Sunday she found her on the sunporch. She seemed to be worse and still was dizzy. The daughter did not notice any restraints. She again walked to the nurses' station with her mother, but held on to her to steady her. She did not discuss the mother's dizziness with the hospital personnel, or request them for assistance to get her mother back to her room. On the next day, October 12, 1970, Dr. Farrell called her father to tell him that her mother had fallen and broken her arm. She visited her mother the next morning. Her mother was in bed with ice packs on her shoulder, still very confused, and didn't know what had happened. The mother told her she guessed she had fallen down.
At the time of the trial 4 years later, plaintiff's testimony as to how she sustained the injury was still vague. Although quizzed several times in her direct examination as to her recollection of the fall, she had none, and she had no explanation as to how she broke her arm. When asked, "Is there any recollection at all of taking a fall or bumping the arm?" her answer was, "Know when I fell out of the chair?" The rest of the examination was as follows: "Q. You recall falling on a chair? A. Yeah. Q. Do you recall where that chair was? A. No, I don't. Q. Could you describe how you fell? A. No, I can't. Q. You don't recall whether you landed on your left side on the floor? A. Yeah, I landed on the floor. Q. You landed on the floor. Do you recall if it was a hard surface or if it was a carpeted floor? A. I think it was not carpet but inlaid. Q. An inlaid floor? A. Yes. Q. Hard surface? A. Yes. Q. Was there anyone around when you fell? A. I don't remember that either. Q. Do you recall whether anybody came to assist you? A. No. Q. What did you do after you fell? A. I just walked around, I guess. Q. You got up by yourself? A. Yes. Q. Did you walk back to your room, or did you go somewhere else? A. No, I went to my room."
*574 Plaintiff called Doctor Chester H. Farrell as her witness. He did not remember plaintiff's daughter suggesting that her mother be placed in restraint. He did testify that on October 12 he did not have any orders for the patient to be placed in physical restraint of any kind. At 2:14 p. m. he did order her to bed rest because of excessive menstruation, and requested that she be checked by a gynecologist. He testified the plaintiff's conduct was the opposite of aggressiveness. The only time he recommends restraint is when a patient is disturbed in an aggressive fashion. He has never known the plaintiff to be aggressive. He permitted her to move about to attempt to get her to relate to other people. She was withdrawn and did not relate. She was in fact more or less mute. He had read the nurses' daily reports and was aware of plaintiff's pacing and fending falls.
The nurses' notes for Sunday, October 11, 1970, are as follows: "Awaken by roommate a couple timesappeared quite confused when awakened, called for a nurse but didn't want anything. * * * Very rigid and much pacing. Door to room was locked because was constantly in bed. On sunporch lying on couch. Needed firm direction to sit up. * * * Continues to pace and appear rigid. States she feels nervous and all she feels will help is the pacing. Husband and daughter here to visit. Needs encouragement to sit up on couch."
The notes on October 12, until the complaint about the pain in her shoulder, are as follows: "Apparently slept * * * up to breakfast, later on sunporch, began falling about on porch, does this mostly when staff is around, also seems bland and when walking, she starts to tip over on face, refused to take bath, ate lunch well. Later was bathed by staff, put on sunporch in chair. Now in bed until Dr. sees her tomorrow."
The plaintiff offered in evidence some excerpts from the Manual of Policies and Procedures of the Creighton Memorial St. Joseph's Hospital Psychiatric Unit. Portions of these excerpts set out in the plaintiff's brief, are as follows:
"OLV III is a maximum security nursing unit with limitations to provide the patient with protection from himself and the environment and to reduce stimuli. Furnishings of the unit are limited to essentials to reduce hazards.
"It is the responsibility of the nursing personnel to create an atmosphere of warmth and acceptance. This therapeutic environment is reflected by attitudes and vigilance for the patient's well being. * *
"Every precaution has been taken to prevent harm to the patient. * * *
"All doors leading to the nursing unit are to be locked at all times. * * *
"The patient must be supervised at all times and may leave the nursing unit only with the permission from an attending physician and when accompanied by a personnel member. * * *
"Assist ambulatory patients as needed, promote a feeling of doing as much as possible for themselves. Patients who need to use a wheel chair will also need the use of the safety belt.
"Awareness of patient's total condition is extremely important to prevent falls while resting in bed or maintaining bed rest. Protective measures for the patients are the use of siderails, safety vests and a Hi-Lo bed when available. Conditions which warrant such measures are:
"Elderly patients who are confused, weak or unsteady
"Patients under heavy sedation who may become disoriented or unaware of their ability to be up without support
"Patients who refuse to maintain bed rest, e. g., ataxia or possible postural hypotension from medications, cardia involvement
"Comatose or hemiplegic patients
"Post-operative patients."
*575 Plaintiff's case is predicated on the fact that the plaintiff fell. How, or when, or why is not explained in the record. The inference plaintiff seeks to draw is plaintiff could not have broken her arm unless the defendant was negligent. In an action for negligence the burden is on the plaintiff to show that there was a negligent act or omission by the defendant and that it was the proximate cause of plaintiff's injury or a cause which proximately contributed to it. Saab v. Omaha & C. B. St. Ry. Co. (1960), 170 Neb. 198, 102 N.W.2d 59.
The burden of proving a cause of action is not sustained by evidence from which the jury can arrive at its conclusion only by mere guess or conjecture. Odom v. Willms (1964), 177 Neb. 699, 131 N.W.2d 140.
Plaintiff first argues that the hospital personnel were under a duty to restrain the plaintiff for her own protection. The fallacy with this argument is that the attending psychiatrist did not require restraints, and he had the benefit of the same hospital notes which plaintiff contends are sufficient to charge the hospital personnel with notice. In fact, when his attention was called to the notes, he stated that he relied on his own opinion. The evidence is as follows: "Q. Now, if the nurse who you talked to had dismissed these episodes of falling around on the porch as minor, attention-getting activity, your knowledge of the situation would rely pretty much on what she tells you; isn't that right? A. Well, as far as the telling, yes. I still would reserve the right to make my own opinion. I have always done that. I probably always will. I don't always pay attention to what is told me. I have to go and look for it myself because the responsibility for that patient is still on my back." Obviously, we cannot infer negligence on the part of the hospital personnel in failing to use restraints when they had advised the doctor of the situation and were following his directions. As the doctor said, he was in charge. The doctor testified he did not prescribe restraints. If he had done so, he would have made a record of it.
Negligence is never presumed. The mere happening of an accident does not create a presumption or authorize an inference of negligence. That is the plaintiff's dilemma. She did sustain a broken arm, but there is no definite testimony as to how, when, or why it may have happened. It is not known whether plaintiff was sitting in a chair and fell out of it onto the floor. It is not known whether she walked into a chair and fell. It is not known whether the incident occurred on the sunporch or if she fell down or against the wall in the hall. In fact there is no evidence she fell except the nature of the injury and plaintiff's vague testimony. It is evident from the record, however, that she was not in her room nor in her bed, and she was ambulatory as per her doctor's orders. We have merely the inference plaintiff seeks to draw that if the hospital personnel had exercised reasonable supervision and assistance she would not have sustained the injury. At best, this is nothing more than surmise or conjecture.
It is entirely possible the hospital staff could have been providing the utmost in supervision and the plaintiff still could have sustained the injury. The staff was merely following the doctor's orders in giving plaintiff the freedom of the ward and in putting her on the sunporch. This is not a res ipsa loquitur case. Negligence is not presumed. The mere fact that the plaintiff had a broken arm does not prove that the hospital personnel were negligent. It is essential to the existence of negligence that there be some fault on the part of the person sought to be held liable. The burden of proving a cause of action is not sustained by evidence from which negligence can only be surmised or conjectured. Schroeder v. Sharp (1950), 153 Neb. 73, 43 N.W.2d 572.
What is reasonable supervision and assistance? Does it mean constant supervision? Does it mean that a hospital attendant must be with the patient every second *576 of the day? There is no showing of any hospital standard requiring a constant, one-on-one attendance and observation by nurse, technician, or aide for every patient. In the absence of evidence to the contrary, we do not interpret reasonable supervision to require this type of care.
On October 11, when the daughter and the husband left the hospital, the plaintiff walked them to the door of the nurses' station, which was about five doors from her room. The daughter testified her mother had an unsteady gait but did not require assistance for her mother from any of the hospital personnel nor did she discuss her mother's dizziness with any of them. We must assume that she believed that her mother would get back to her room without difficulty.
We are unable to find any evidence in the record sufficient to require the submission of this case to the jury. There is no proof of any negligence which was the proximate cause of plaintiff's injury. In every case before an issue may be submitted to a jury, there is a preliminary question for the court, not whether there is literally no evidence, but whether there is sufficient evidence upon which a jury can properly proceed to find a verdict for the party upon whom the burden is imposed. Fairmont Creamery Co. v. Thompson (1941), 139 Neb. 677, 298 N.W. 551. The trial court properly directed a verdict against the plaintiff herein.
The judgment is affirmed.
Affirmed.